# UNITED STATES DISTRICT COURT

## DISTRICT OF PUERTO RICO

| | |
|---|---|
| MINERVA MARIA HERNANDEZ UMPIERRE, and BETZAIDA SANTOS PAGAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>BAYAMON MEDICAL CENTER, a medical facility, and DOES 1 to 10, inclusive,<br><br>        Defendants. | CASE NO.: 20-cv-01237<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

TO THE HONORABLE COURT:

NOW APPEAR Plaintiffs Minerva Maria Hernandez Umpierre and Betzaida Santos Pagan ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action based upon their personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation of their attorneys.

## NATURE OF THE ACTION

1.     Defendant Bayamon Medical Center ("BMC"), is a hospital.  Thousands of patients count on BMC to treat them competently and to handle their sensitive medical and personal information with care.

2.     These patients reasonably expect the highest level of protection for their private identifiable information, when giving highly sensitive information such as their Social Security numbers and medical information to medical providers and insurers.  What these patients do not expect, and did not expect, was that their personal and sensitive information would be harvested by unauthorized individuals.

3.     Plaintiffs, individually and on behalf of those similarly situated persons (hereafter, "Class Members"), bring this class action to secure redress against Defendants for their reckless

and negligent violation of patient privacy rights. Plaintiffs and Class Members are patients of BMC who were exposed by a data breach.

4.    Plaintiffs and Class Members suffered significant injuries and damages. On information and belief, the security breach compromised clinical, demographic and financial information such as the full names, social security numbers, dates of birth, and diagnoses. (referred to collectively as "PII")[1] of Plaintiffs and the Class Members.

5.    As a result of Defendants' wrongful actions and inactions, unauthorized individuals gained access to and harvested Plaintiffs' and Class Members' PII. Plaintiffs have been forced to take remedial steps to protect themselves from future loss. Indeed, all Class Members are currently at a very high risk of identity theft and/or credit fraud, and prophylactic measures, such as the purchase of credit monitoring, are reasonable and necessary to prevent and mitigate future loss.

6.    As a result of Defendants' wrongful actions and inactions, patient information was stolen. Many BMC patients have had their PII compromised, have had their privacy rights violated, have been exposed to the risk of fraud and identify theft, and have otherwise suffered damages.

7.    Further, despite the fact that the breach was discovered on May 21, 2019, Defendants did not begin notifying their customers of the event until July 19, 2019, almost two months later.

## THE PARTIES

8.    Plaintiff Minerva Maria Hernandez Umpierre is a Puerto Rico citizen residing in Bayamon, Puerto Rico. Plaintiff Umpierre received medical care from BMC, pursuant to which BMC obtained Plaintiff's PII.

9.    Plaintiff Betzaida Santos Pagan is Puerto Rico citizen residing in Bayamon, Puerto Rico. Plaintiff Pagan received medical care from BMC, pursuant to which BMC obtained Plaintiff's PII.

10.    Plaintiffs are informed and believe that, as a result of the data breach that took

---

[1] The PII here referenced also constitutes PHI as defined by HIPAA.

place at BMC, Plaintiffs' PII was accessed by hackers. As a result, Plaintiffs have to purchase credit and personal identity monitoring services to alert them to potential misappropriation of their identities and to combat risk of further identity theft. At a minimum, therefore, Plaintiffs have suffered compensable damages because they will be forced to incur the cost of a monitoring service, which is a reasonable and necessary prophylactic step to prevent and mitigate future loss. Exposure of Plaintiffs' PII as a result of the data breach has placed them at imminent, immediate and continuing risk of further identity theft-related harm.

11.     Defendant BMC is a medical facility with its principal offices located in Bayamon, Puerto Rico.

12.     Plaintiffs is unaware of the true names, identities, and capacities of the Defendants sued herein as DOES 1 to 10. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of DOES 1 to 10 if and when ascertained. Plaintiffs is informed and believes, and thereupon alleges, that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings alleged herein and that each of the Defendants sued herein as a DOE proximately caused injuries and damages to Plaintiffs and Class Members as set forth below.

13.     As used herein, "Defendants" shall refer to BMC, and DOES 1 to 10, collectively.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), since some of the Class Members are citizens of a State different from the Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million.

15.     The Court has personal jurisdiction over Defendants because Plaintiffs' and Class Members' claims arise out of Defendants' business activities conducted in Puerto Rico, where Defendants' headquarters are located.

16.     Venue is appropriate in this District because: (a) Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the claim occurred in this District and (c) Defendants have minimum contacts in this District comprised of a substantial amount of

business conducted in this District, out of which the causes of action arose.

## FACTUAL ALLEGATIONS

### A. The Data Breach

17.     On May 21, 2019, Defendant BMC discovered that it had been subject to a ransomware attack.  During this hack, critical patient PII was exposed to the hackers.

18.     On July 19, 2019, almost two months later, Defendants began sending letters to the breach victims to inform them of the data breach.  While Defendants claim in their letter that no information was exposed to hackers, but that internal information was merely "blocked", Defendants also admit in that letter that the PII was encrypted during the breach.  The hackers could not have encrypted the data without gaining access to the data.

19.     Defendants made repeated promises and representations to their patients, which formed a part of their contracts with those patients, that they would protect Plaintiffs' and the Class Members' PII from disclosure to third parties, including taking appropriate steps to safeguard their electronic databases.  On information and belief, Defendants provided their patients with a Privacy Notice stating that they would disclose their PII only to certain specifically defined individuals and entities, and would otherwise protect that PII from disclosure, not sharing it with anyone else without written authorization.

20.     Defendants promised that they would not disclose Plaintiffs' and the Class Members' PII to any unauthorized third parties.  In fact, they allowed hackers to obtain it.

### B. Defendants Had an Obligation to Protect Personal Information under Federal Law.

21.     Defendants are entitles covered by HIPAA (*see* 54 C.F.R. § 160.102) and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information").

22.     HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."  45 C.F.R. § 164.502.  HIPAA also requires that Defendants implement appropriate safeguards for this information.  45 C.F.R. § 164.530(c)(1).  HIPAA additionally requires that Defendants provide notice of a breach of

4

unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable—i.e. non-encrypted data—to unauthorized third parties. 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

23. Additionally, HIPAA requires that Defendants:

(a) Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights, *see* 45 C.F.R. § 164.312(a)(1);

(b) Implement policies and procedures to prevent, detect, contain, and correct security violations, *see* 45 C.F.R. § 164.306(a)(1);

(c) Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, *see* 45 C.F.R. § 164.306(a)(2);

(d) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, *see* 45 C.F.R. § 164.306(a)(3);

(e) Ensure compliance with the HIPAA security standard rules by its workforce, *see* 45 C.F.R. § 164.306(a)(4); and

(f) Effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b).

24. Defendants are additionally prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015). [2]

25. The Federal Trade Commission ("FTC") has issued numerous guides for business

---

[2] Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 22, 2019).

highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

26.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[3]  Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[4]

27.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[5]

28.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet

---

[3] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 22, 2019).

[4] *Id*.

[5] Federal Trade Commission, *Start With Security A Guide for Business* (Jun. 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Dec. 10, 2019).

their data security obligations. [6]

29.     In this case, Defendants were fully aware of their obligation to use reasonable measures to protect the personal information of their patients, acknowledging as much in their own privacy policies. Defendants also knew they were targets for hackers. But despite understanding the consequences of inadequate data security, Defendants failed to comply with industry-standard data security requirements.

30.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to members' information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### C.  Applicable Standards of Care

31.     In addition to their obligations under federal law, Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems and networks, and the personnel responsible for them, adequately protected the PII of Plaintiffs and the Class Members.

32.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to design, maintain, and test their computer system to ensure that the PII in Defendants' possession was adequately secured and protected.

33.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to create and implement reasonable data security practices and procedures to protect the PII in their possession, including adequately training their employees and others who accessed PII within their computer systems on how to adequately protect PII.

---

[6] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Nov. 22, 2019).

34.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to implement processes that would detect a breach of their data security systems in a timely manner.

35.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to act upon data security warnings and alerts in a timely fashion.

36.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to disclose if their computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to purchase insurance or other health care services from Defendants' or to entrust PII with Defendants.

37.     Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to disclose in a timely and accurate manner when data breaches occurred.

38.     Defendants owed a duty of care to Plaintiffs and the Class Members because they were foreseeable and probable victims of any inadequate data security practices.  Defendants received the PII from other parties with the understanding that Plaintiffs and the Class Members expected their PII to be protected from disclosure.  Defendants knew that a breach of the hospitals' data systems would cause Plaintiffs and the Class Members to incur damages.

### D.  Stolen Information Is Valuable to Hackers and Thieves

39.     It is well known, and the subject of many media reports, that PII is highly coveted and a frequent target of hackers.  According to a report by the HIPAA Journal, "healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 9 years, with 2018 seeing more data breaches reported than any other year since records first started being published."[7] As reflected in the chart below, many of the largest healthcare breaches over the last decade have involved millions of patient or member records.

---

[7] Healthcare Data Breach Statistics, HIPAA JOURNAL,
https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Aug. 9, 2019).

## Largest Healthcare Data Breaches (2009-2018)

| Rank | Name of Covered Entity | Year | Covered Entity Type | Individuals Affected | Type of Breach |
|------|------------------------|------|---------------------|---------------------|----------------|
| 1 | Anthem Inc. | 2015 | Health Plan | 78,800,000 | Hacking/IT Incident |
| 2 | Premera Blue Cross | 2015 | Health Plan | 11,000,000 | Hacking/IT Incident |
| 3 | Excellus Health Plan Inc. | 2015 | Health Plan | 10,000,000 | Hacking/IT Incident |
| 4 | Science Applications International Corporation | 2011 | Business Associate | 4,900,000 | Loss |
| 5 | University of California, Los Angeles Health | 2015 | Healthcare Provider | 4,500,000 | Hacking/IT Incident |
| 6 | Community Health Systems Professional Services Corporations | 2014 | Business Associate | 4,500,000 | Hacking/IT Incident |
| 7 | Advocate Medical Group | 2013 | Healthcare Provider | 4,029,530 | Theft |
| 8 | Medical Informatics Engineering | 2015 | Business Associate | 3,900,000 | Hacking/IT Incident |
| 9 | Banner Health | 2016 | Healthcare Provider | 3,620,000 | Hacking/IT Incident |
| 10 | Newkirk Products, Inc. | 2016 | Business Associate | 3,466,120 | Hacking/IT Incident |

40.     Despite well-publicized litigation and frequent public announcements of data breaches, Defendants maintained an insufficient and inadequate system to protect the PII of Plaintiffs and Class Members.

41.     Legitimate organizations and members of the criminal underground alike

recognize the value of PII. Otherwise, they would not aggressively seek and pay for it. As previously seen in one of the world's largest data breaches, hackers compromised the card holder data of 40 million of Target's customers. *See* "Target: 40 million credit cards compromised," CNN Money, Dec. 19, 2013, *available* at http://money.cnn.com/2013/12/18/news/companies /target-credit-card/. DataCoup is, in contrast, just one example of a legitimate business that pays users for personal information. *See* http://money.com/money/3001361/datacoup-facebook-personal-data-privacy/.

42. PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps." *See* Krebs on Security April 16, 2016, Blog Post, *available at* https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/. PII can be used to clone a debit or credit card. *Id.*

43. Once someone buys PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

44. Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[8]

### E. The Data Breach Has Resulted and Will Result in Identity Theft and Identity Fraud

45. Defendants failed to implement and maintain reasonable security procedures and practices appropriate to protect the PII of Plaintiffs and Class Members.

---

[8] https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf

46.     The ramifications of Defendants' failure to keep Plaintiffs' and Class Members' PII secure is severe.  According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year."  "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at http://www.foxbusiness.com/personal-finance/2014/02/05/someone-became-identitytheft-victim-every-2-seconds-last-year.html.

47.     In the case of a data breach, simply reimbursing a consumer for a financial loss due to fraud does not make that individual whole again.  On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."  *See* "Victims of Identity Theft," U.S. Department of Justice, Dec 2013, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf.   In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."  *Id*. at 11.

48.     A person whose PII has been obtained and compromised may not know or experience the full extent of identity theft or fraud for years.  It may take some time for the victim to become aware of the theft or fraud.  In addition, a victim may not become aware of fraudulent charges when they are nominal, because typical fraud-prevention algorithms fail to capture such charges.  Those charges may be repeated, over and over again, on a victim's account, without notice for years.

49.     The damage from PII exposure is particularly acute in the medical context.  A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.  *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010, 5:00 a.m.), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/. Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve

their identity theft at all. *Id.*

50.     The Personal Information exposed in the Data Breach is highly-coveted and valuable on underground or black markets. For example, a cyber "black market" exists in which criminals openly post and sell stolen consumer information on underground internet websites known as the "dark web" – exposing consumers to identity theft and fraud for years to come. Identity thieves can use the Personal Information to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest. Medical data is particularly valuable because unlike financial information, such as credit card numbers which can be quickly changed, medical data is static. This is why companies possessing medical information, like Defendants, are intended targets of cyber-criminals.

51.     The Personal Information also has substantial legitimate value to Defendants. As Defendants' privacy policies recognize, they use Plaintiffs' Personal Information for business purposes other than administering claims. Many companies that retain Personal Information like that exposed in the data breach attribute inherent monetary value to it—even listing it as an asset on their books or using it as collateral or consideration for other transactions. Personal Information, including de-identified medical information, is a valuable commodity in the data-driven market place and is often sold and traded between companies—subject to legal and contractual restrictions.

52.     And consumers are injured every time their data is stolen and placed on the dark web—even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple and discrete repositories of stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases, and viewed and used by different

criminal actors.

53.     Exposure of this information to the wrong people can have serious consequences. The impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans, such as student loans or mortgages.[9] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

54.     Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[10]

55.     As a result of the data breach, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are also subject to a higher risk of phishing and pharming where hackers exploit information they already obtained in an effort to procure even more PII. Plaintiffs and Class Members are presently incurring and will continue to incur such damages in addition

---

[9] Identity Theft Resource Center, *The Aftermath 2017*, https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited Nov. 22, 2019).

[10] FTC, *Combating Identity Theft A Strategic Plan* (April 2007), available at https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited Nov. 22, 2019).

to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies. In addition, Plaintiffs and Class Members now run the risk of unauthorized individuals creating credit cards in their names, taking out loans in their names, and engaging in other fraudulent conduct using their identities.

### F. *Plaintiffs and Class Members Suffered Damages*

56. The exposure of Plaintiffs' and Class Members' PII to unauthorized third-party hackers was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by their contracts with Plaintiffs and the Class Members, and federal law. The data breach was also a result of Defendants' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, also required by their contracts and federal law

57. Plaintiffs' and Class Members' PII is private and sensitive in nature and was inadequately protected by Defendants. Defendants did not obtain Plaintiffs' and Class Members' consent to disclose their PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

58. As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting data breach, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity. Plaintiffs have also incurred out-of-pocket losses for purchase of costly credit monitoring services.

59. Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' PII, causing

them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.  The improper disclosure, compromising, and theft of their PII;

b.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of unauthorized third-party hackers and misused via the sale of Plaintiffs' and Class Members' information on the Internet black market;

c.  The untimely and inadequate notification of the data breach;

d.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

e.  Ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market.

## CLASS ACTION ALLEGATIONS

60.  Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated under Rule 23(a), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.  The Class is defined as follows:

> All persons residing in the United States whose Personal Identifying Information was compromised as a result of the data breach of the Puerto Rico Women's and Children's Hospital and/or the data breach of Bayamon Medical Center, discovered on May 21, 2019.

61.  Excluded from the Class are: (a) Defendants, including any entity in which any of the Defendants has a controlling interest, is a parent or a subsidiary of, or which is controlled by any of the Defendants; (b) the officers, directors, and legal representatives of Defendants; and (c) the judge and the court personnel in this case as well as any members of their immediate families. Plaintiffs reserve the right to amend the definition of the Class if discovery, further investigation and/or rulings by the Court dictate that it should be modified.

62.  *Numerosity*. The members of the Class are so numerous that the joinder of all Class Members is impractical.  While the exact number of Class Members is unknown to Plaintiffs at

this time, given the number of patients who trust their care to Defendants, it stands to reason that the number of Class Members is in the thousands. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, such as account information.

63. *Commonality and Predominance*. There are questions of law and fact common to Class Members, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants owed a duty of care to Plaintiffs and Class Members with respect to the security of their PII;

b. What security measures must be implemented by Defendants to comply with their duty of care;

c. Whether Defendants met the duty of care owed to Plaintiffs and the Class Members with respect to the security of the PII;

d. Whether Defendants have a contractual obligation to Plaintiffs and Class Members to use reasonable security measures;

e. Whether Defendants have complied with any contractual obligation to use reasonable security measures;

f. What security measures must be implemented by Defendants to comply with their contractual obligations to use reasonable security measures;

g. Whether Defendants' acts and omissions described herein violated the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E;

h. Whether Defendants' acts and omissions described herein violated the Federal Trade Commission Act, 15 U.S.C. § 45;

i. What security measures, if any, must be implemented by Defendants to comply with their contractual and statutory obligations;

j. The nature of the relief, including equitable relief, to which Plaintiffs and Class Members are entitled; and

k.   Whether Plaintiffs and Class Members are entitled to damages, civil penalties and/or injunctive relief.

64.   *Typicality*. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of each of the other Class Members, was exposed and/or improperly disclosed by Defendants.

65.   *Adequacy of Representation*. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs and Class Members have a unified and non-conflicting interest in pursuing the same claims and obtaining the same relief.  Therefore, all Class Members will be fairly and adequately represented by Plaintiffs and their counsel.

66.   *Superiority of Class Action*. A class action is superior to other available methods for the fair and efficient adjudication of the claims alleged in this action. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in the management of this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

67.   Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class Members, such that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## FIRST CAUSE OF ACTION

(Breach of Express And/or Implied Contractual Promise)

68.   Plaintiffs repeat and incorporates herein by reference each and every allegation contained in paragraphs 1 through 67, inclusive, of this Complaint as if set forth fully herein.

69.   Defendants were parties to contracts with Plaintiffs and the Class Members for

medical services, pursuant to which Defendants obtained Plaintiffs' and the Class Members' PII.

70. As a part of these contracts, Defendants promised to maintain adequate safeguards to protect the PII from disclosure to unauthorized third parties, and also promised not to disclose the PII to unauthorized third parties. Defendants promised that they would disclose the PII only to specifically enumerated persons and entities who are not at issue in this litigation, and would protect the PII from disclosure to any other parties.

71. Accordingly, Defendants' promises to safeguard and protect the PII are contractually binding upon Defendants with regard to Plaintiffs and each of the Class members.

72. The contractual duty to protect and safeguard Plaintiffs' and the Class Members' PII, which Defendants promised to undertake, was, even apart from the language of the contracts, a term of the contracts by operation of law under the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E., and under the Federal Trade Commission Act, 15 U.S.C. § 45. Under applicable common law, all laws in place at the time a contract is entered which are relevant to the subject matter of that contract become binding terms of the contract. Therefore, the HIPAA Privacy Rule and Security Rule, and the FTCA also formed a contractual term in each of Defendants' contracts with Plaintiffs and the Class Members.

73. Finally, the promise to safeguard and protect Plaintiffs' and the Class Members' PII, and keep that PII from being accessed by third parties, was implied as a matter of law because Defendants and Plaintiffs and the Class Members entered their agreements with the expectation and implied mutual understanding that Defendants would strictly maintain the confidentiality of the PII and safeguard it from theft or misuse.

74. Therefore, Plaintiffs and Class Members entered contracts for medical services with Defendants in which Defendants agreed to: (a) implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' personal information from unauthorized access, destruction, use, modification, or disclosure; and (b) prevent unauthorized third parties from obtaining access to Plaintiffs' and Class Members' PII.

75. Plaintiffs and the Class Members would not have provided and entrusted the PII to Defendants in the absence of the proper security safeguards and the promise to keep their PII

safe.

76. Plaintiffs and the Class Members fully performed their obligations under their agreements with Defendants.

77. Defendants breached the contractual promises by failing to: (a) implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure; and (b) prevent unauthorized third parties from obtaining access to Plaintiffs' and Class Members' PII.

78. Plaintiffs' and the Class Members' expectation was that their PII would be safeguarded and protected. Therefore, they agreed to pricing terms to which they would not have agreed had they known that their PII would not be protected. Further, due to the fact that their PII was not protected, Plaintiffs and the Class Members incurred losses associated with the loss of PII privacy, including theft, identity theft, and the risk of theft and identity theft, along with the necessity of cancelling credit cards and paying for additional protection through the market. The risk of identity theft which Plaintiffs now faces is considerable. Hackers do not target PII without the intent to use it fraudulently.

79. As a direct and proximate result of Defendants' breaches of the contractual promises alleged herein, Plaintiffs and Class Members sustained actual losses and damages in an amount according to proof at trial but in excess of the minimum jurisdictional requirement of this Court.

## SECOND CAUSE OF ACTION

(Breach of Covenant of Good Faith and Fair Dealing)

80. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79, inclusive, of this Complaint as if set forth fully herein.

81. Applicable law implies a covenant of good faith and fair dealing in every contract.

82. Plaintiffs and Class Members entered contracts with Defendants for medical services.

83. Plaintiffs and the Class Members performed all of their duties under their agreements with Defendants.

84. All of the conditions required for Defendants' performance under the contracts have occurred.

85. Incorporated in the contracts as a matter of law was the covenant of good faith and fair dealing, which prevents a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. The implied covenant imposes on a contracting party not only the duty to refrain from acting in a manner that frustrates performance of the contract, but also the duty to do everything that the contract presupposes that the contracting party will do to accomplish its purposes.

86. Here the implied covenant of good faith and fair dealing required Defendants, under the terms of their agreement which stated that Defendants would protect the PII, to safeguard and protect from disclosure to third parties the PII of Plaintiffs and the Class Members which was turned over to Defendants only for the purposes of performing medical services. Plaintiffs and the Class Members could not enjoy Defendants' services without the safeguarding and protection of the PII.

87. Defendants breached the covenant of good faith and fair dealing implied in their contracts by engaging in the following conscious and deliberate acts: (a) failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure; and (b) failing to ensure that unauthorized parties were not provided access to Plaintiffs' and Class Members' PII. Defendants' failure to protect the PII of Plaintiffs and Class Members frustrated Plaintiffs' and the Class Members' rights to the benefit of their bargains with Defendants, to enjoy the professional services of Defendants without incurring risks of property and identity theft.

88. Plaintiffs' and the Class Members' expectation was that their PII would be safeguarded and protected. Therefore, they agreed to pricing terms to which they would not have agreed had they known that their PII would not be protected. Further, due to the fact that their PII was not protected, Plaintiffs and the Class Members incurred losses associated with the loss of PII privacy, including theft, identity theft, and the risk of theft and identity theft, along with the necessity of cancelling credit cards and paying for additional protection through the market.

The risk of identity theft which Plaintiffs now faces is considerable. Hackers do not target PII without the intent to use it fraudulently.

89.     As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## THIRD CAUSE OF ACTION

(Negligence)

90.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 89, inclusive, of this Complaint as if set forth fully herein.

91.     As described above, Defendants owed Plaintiffs and the Class Members duties of care in the handling of PII, which duties included keeping that PII safe and preventing disclosure of that PII to all unauthorized third parties.

92.     Additionally, Defendants owed a duty to Plaintiffs and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' PII as required by HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E, and Federal Trade Commission Act, 15 U.S.C. § 45. This legal duty arises outside of any contractual, implied or express, responsibilities that Defendants had between Plaintiffs and Class Members, as it is completely independent of any contract.

93.     HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information." 45 C.F.R. § 164.502. HIPAA also requires that Defendants implement appropriate safeguards for this information. 45 C.F.R. § 164.530(c)(1). HIPAA additionally requires that Defendants provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable—i.e. non-encrypted data—to unauthorized third parties. 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

94.     Additionally, HIPAA requires that Defendants:

(a) Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights, *see* 45 C.F.R. § 164.312(a)(1);

(b) Implement policies and procedures to prevent, detect, contain, and correct security violations, *see* 45 C.F.R. § 164.306(a)(1);

(c) Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, *see* 45 C.F.R. § 164.306(a)(2);

(d) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, *see* 45 C.F.R. § 164.306(a)(3);

(e) Ensure compliance with the HIPAA security standard rules by its workforce, *see* 45 C.F.R. § 164.306(a)(4); and

(f) Effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b).

95.     Plaintiffs and Class Members are within the class of persons that HIPAA was intended to protect.

96.     Defendants violated the above listed regulations by disclosing the PII to third parties and by failing to implement adequate security measures to protect the PII, including failing to:

(a) Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights;

(b) Implement policies and procedures to prevent, detect, contain, and correct security violations;

(c) Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information;

(d) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information;

(e) Ensure compliance with the HIPAA security standard rules by its workforce; and

(f) Effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information.

97.     Defendants also violated §§ 164.404 and 164.402 by failing to provide timely notice of the breach to Plaintiffs and the Class Members.

98.     The harm that occurred as a result of the security breach is the type of harm that

HIPAA was intended to guard against. HIPAA directly requires subject entities to protect the health information of individuals such as Plaintiffs and the Class Members.

99. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

100. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

101. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach at a company as large as Defendants', including, specifically, the damages that would result to Plaintiffs and Class members.

102. The harm that occurred as a result of the security breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

103. Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

104. In addition to their obligations under state and federal law, Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to provide reasonable security, including consistency with industry standards and

23

requirements, and to ensure that their computer systems and networks, and the personnel responsible for them, adequately protected the PII of Plaintiffs and the Class Members.

105.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to design, maintain, and test their computer system to ensure that the PII in Defendants' possession was adequately secured and protected.

106.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to create and implement reasonable data security practices and procedures to protect the PII in their possession, including adequately training their employees and others who accessed PII within their computer systems on how to adequately protect PII.

107.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to implement processes that would detect a breach of their data security systems in a timely manner.

108.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to act upon data security warnings and alerts in a timely fashion.

109.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to disclose if their computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to purchase insurance or other health care services from Defendants' or to entrust PII with Defendants.

110.    Defendants owed a duty to Plaintiffs and the Class Members, who entrusted them with sensitive PII, to disclose in a timely and accurate manner when data breaches occurred.

111.    Defendants owed a duty of care to Plaintiffs and the Class Members because they were foreseeable and probable victims of any inadequate data security practices.  Defendants collected Plaintiffs' and the Class Members' PII.  Defendants knew that a breach of their data systems would cause Plaintiffs and the Class Members to incur damages.

112.    Defendants breached those duties of care by adopting inadequate safeguards to protect the PII, and, on information and belief, failing to adopt industry-wide standards in their supposed protection of the PII, resulting in the disclosure of the PII to unauthorized third parties.

113.     As a direct and proximate result of Defendants' failure to adequately protect and safeguard the PII, Plaintiffs and the Class members suffered damages.  Plaintiffs and the Class Members were damaged because their PII was accessed by third parties, resulting in increased risk of identity theft and theft of property, and for which Plaintiffs and the Class members were forced to adopt costly and time-consuming preventive and remediating efforts.  For instance, Plaintiffs and the Class Members were forced to pay out of pocket costs for credit monitoring services.  Plaintiffs and the Class Members were also damaged in that they paid for services in an amount that they would have refused to pay had they known that Defendants would not protect their PII.  Plaintiffs and the Class Members accepted pricing terms which they would not have agreed to had they known that Defendants would not protect their PII.  Additionally, the increased risk of identity theft which Plaintiffs now faces is considerable.  Hackers do not target PII without the intent to use it fraudulently.

114.     Defendants acted with wanton disregard for the security of Plaintiffs' and the Class Members' PII.  Defendants knew or should have known that Defendants had inadequate computer systems and data security practices to safeguard such information, and Defendants knew or should have known that hackers were attempting to access the PII of health care providers' databases, such as Defendants'.

115.     The injury and harm suffered by Plaintiffs and the Class Members was the reasonably foreseeable result of Defendants' breach of their duties.  Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and the Class Members to experience the foreseeable harm associated with the exposure of their PII.

116.     A "special relationship" exists between Defendants and Plaintiffs and the Class Members.  Defendants entered into a "special relationship" with Plaintiffs and the Class Members when they contracted with Plaintiffs' and the Class Members to provide them with medical care and obtained Plaintiffs' and the Class Members' PII from them.  As providers of health care services, Defendants stand in a fiduciary or quasi-fiduciary relationship with Plaintiffs and the Class Members.

117. Plaintiffs and the Class Members have suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendants as alleged herein in an amount to be proven at trial but in excess of the minimum jurisdictional amount of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows:

1. For compensatory damages in an amount according to proof at trial;

2. For punitive damages in an amount according to proof at trial;

3. For affirmative injunctive relief mandating that Defendants implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure;

4. For costs of suit and litigation expenses;

5. For attorneys' fees under the common fund doctrine and all other applicable law; and

6. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial for all claims so triable.

Dated: May 22nd, 2020

Respectfully submitted,

 /s/ *David C. Indiano*
David C. Indiano USDC Bar No. 200601
david.indiano@indianowilliams.com
Jeffrey M. Williams USDC Bar No. 202414
jeffrey.williams@indianowilliams.com
Vanesa Vicéns-Sánchez USDC Bar No. 217807
vanesa.vicens@indianowilliams.com
Christopher A. Dávila USDC Bar No. 304103
c.davila@indianowilliams.com
**INDIANO & WILLIAMS, P.S.C.**
207 del Parque Street, Third Floor
San Juan, Puerto Rico 00912
Telephone: (787) 641-4545
Facsimile: (787) 641-4544

/s/ Thiago M. Coelho
Bobby Saadian*
Justin F. Marquez*
Thiago M. Coelho*
Robert J. Dart*
WILSHIRE LAW FIRM
3055 Wilshire Blvd., 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

(*pro hac vice applications forthcoming)

Attorneys for Plaintiffs and the Proposed Class